1
2
3
4                       UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6

7 PAUL ANTHONY MORENO,           Case No. 22-cv-02267-JST

                Plaintiff,

8

9         v.                 **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; REFERRING CASE TO PRO SE PRISONER MEDIATION PROGRAM; STAYING ACTION; DIRECTIONS TO CLERK**

10 I. PEREZ-PANTOJA,

              Defendant.

11

12

13                             Re: ECF No. 18

14       Plaintiff, an inmate housed at Correctional Training Facility ("CTF), has filed a *pro se*

15 complaint under 42 U.S.C. § 1983 alleging that CTF correctional officer I. Perez-Pantoja:

16 (1) retaliated against him for filing a grievance against non-party CTF correctional officer Bravo

17 by searching his cell and destroying his property during the search, in violation of the First

18 Amendment; and (2) was deliberately indifferent to Plaintiff's serious needs by failing to follow

19 COVID-19 protocols when searching Plaintiff's cell, in violation of the Eighth Amendment.  ECF

20 Nos. 1, 6.  Now pending before the Court is Defendants' motion for summary judgment.  ECF No.

21 18.  Plaintiff has filed an opposition, ECF No. 22, and Defendants have filed a reply, ECF No. 25.

22 Plaintiff has also requested leave to file a surreply.  ECF No. 26.  For the reasons set forth below,

23 the Court DENIES Plaintiff's request for leave to file a surreply, ECF No. 26, and DENIES

24 Defendant's motion for summary judgment, ECF No. 18.

25 / / /

26 / / /

27 / / /

28 / / /

**DISCUSSION**

**I.      Factual Background[1]**

     **A.      CTF COVID Protocols**

On April 15, 2020, California Correctional Health Care Services ("CCHCS"), which provides health care services to the institutions within the California Department of Corrections and Rehabilitation ("CDCR"), issued a memo requiring prison staff to wear cloth face coverings while working or performing duties on institutional grounds and recommending, but not requiring, that staff observe social distancing.  ECF No. 22-7 at 75-76.  On April 25, 2020, CTF Warden Keonig and CEO Omosaiye issued a memo with the same requirements and recommendations as in CCHCS's April 15, 2020 memo.  ECF No. 22-9 at 45.  On October 27, 2020, CCHCS issued a memo again reiterating the masking requirement for staff and specifying that "properly worn face coverings shall cover the nose, mouth, and chin."  ECF No. 22-7 at 79.  On March 18, 2021, CCHCS issued a memo requiring staff to "adhere to required proper infection control practices, including frequent hand hygiene, six-foot physical distancing, and adherence to the universal use of face masks," but acknowledged that six-foot physical distancing was not always possible.  ECF No. 22-7 at 85.  The memos issued by CCHCS and CTF did not require staff to change masks and gloves between each cell search.  ECF No. 22-7.

     **B.      Plaintiff's RVR for Constructive Possession of Cellphone**

On July 30, 2020, defendant Perez-Pantoja discovered that non-party inmate Hernandez was in possession of a cellphone, in violation of prison rules.  Non-party CTF officer Bravo issued inmate Hernandez a rules violation report for this infraction, to which inmate Hernandez pled guilty.  ECF No. 18-1 at 42- 46; ECF No. 19 at 22-2 at 2.  The cellphone was sent to the Office of Correctional Safety Digital Forensics Team for a forensic investigation.  ECF No. 18-1 at 42- 46; ECF No. 19 at 22-2 at 2.  In reviewing the extracted data, Officer Bravo discovered a photograph, timestamped April 10, 2020, of Plaintiff looking into and posing for the camera, with the background being the inside of a CTF Facility C cell.  ECF No. 18-1 at 42-46.  The photo was

---

[1] The following facts are undisputed unless otherwise noted.

United States District Court
Northern District of California

taken by Plaintiff's cellmate during COVID because Plaintiff wanted to let his family know that he was okay by sending them a picture of himself.  ECF No. 18-1 at 8-9.

On September 25, 2020, defendant Perez-Pantoja told several inmates that they would be issued RVRs for constructive possession of a cellphone and that inmate Hernandez was to blame. ECF No. 22-9 at 15-17, 22, 23. That same day, Plaintiff received an RVR for constructive possession of a cellphone, authored by Officer Bravo.  ECF No. 18-1 at 42-46.  Plaintiff was found guilty of this RVR and lost 61 days of good-time credit. ECF No. 18-1 at 8-9.

C.     Grievance No. 53991 against Officer Bravo

On October 29, 2020, Plaintiff submitted Grievance No. 53991, which alleged that Officer Bravo had violated Cal. Penal Code § 4576 and prison policies when he extracted the cellphone data without a search warrant, and that Officer Bravo shared the data with D-Wing floor staff who used it to harass, intimidate and compel inmates into becoming informants.  ECF No. 18-1 at 53-72.  On November 21, 2020, this grievance was denied, with the finding that the extraction of the cellphone data was consistent with prison operational procedure and Cal. Penal Code § 1546.1(c), and that there was no evidence to substantiate Plaintiff's claims of harassment, intimidation, manipulation, or any other misconduct by the CTF Investigative Services Unit.  ECF No. 18-1 at 49-50.  On December 18, 2020, Plaintiff appealed this denial.  ECF No. 18-1 at 51-52.

D.     May 6, 2021 Cell Search by defendant Perez-Pantoja

In May 2021, CTF correctional officers were required to conduct: (1) a minimum of three random cell searches in facility per shift for two of the three shifts per day, Second Watch, 6:00 am to 2:00 pm, and Third Watch, 2:00 pm to 10:00 p.m.; and (2) daily window checks in addition to the cell searches.  ECF No. 18-2 at 2.  Window checks consist of entering each individual cell, conducting a visual inspection, and checking the back window for structural damage.  Window checks typically take one to two minutes per cell.  ECF No. 1 at 7.  Inmates are typically placed in the day room during cell searches.  ECF No. 18-2 at 2.

On May 6, 2021, defendant Perez-Pantoja was assigned to Facility C's D-Wing, where Plaintiff was housed, and worked Second Watch.  That day, after releasing the West 3rd Tier for modified program showers, defendant Perez-Pantoja began conducting window checks starting at

United States District Court
Northern District of California

3

1   Cell No. 343.  Defendant Perez-Pantoja was accompanied by Officers Sanchez and Lomeli.  ECF

2   No. 1 at 7.  Plaintiff was not in his cell at this time.

3          When defendant Perez-Pantoja and officer Sanchez reached Cell No. 334, they conducted a

4   cell search.  Plaintiff observed defendant Perez-Pantoja touching electronics, sitting on the bunk

5   bed, and rummaging through inmates' personal property with his face mask down.  ECF No. 1 at

6   7.  Next, instead of moving to the next cell, Cell No. 333, defendant Perez-Pantoja went straight to

7   Plaintiff's cell, Cell No. 324, and conducted a window check and cell search.  Defendant Perez-

8   Pantoja did not change his latex gloves or face mask prior to entering Plaintiff's cell.  Dkt. No. 1-

9   7.  During the cell search, officer Lomeli stood outside the cell and provided coverage while

10   defendant Perez-Pantoja conducted the search.  ECF No. 18-2 at 3.  Plaintiff witnessed defendant

11   Perez-Pantoja enter the cell but could not see into the cell during the search.  ECF No. 18-1 at 14.

12   Plaintiff was on the second tier across from his cell and could hear property crash onto the floor

13   and metal lockers scraping against the floor as they were moved around.  Dkt. No. 1 at 7.  Plaintiff

14   alleges that, during the cell search, defendant Perez-Pantoja destroyed Plaintiff's eyeglasses and

15   his CD by pushing them to the floor.  ECF No. 22-1 at 5.  Defendant Perez-Pantoja denies pushing

16   any of Plaintiff's property to the ground during the cell search and alleges that he did not notice

17   any eyeglasses or broken CDs during the cell search.  ECF No. 18-2 at 3.

18          Defendant Perez-Pantoja alleges that the window check and cell search of Plaintiff's cell

19   were random and conducted as part of his required daily cell searches.  ECF No. 18-2 at 3.

20   Plaintiff alleges that both the window check and cell search were retaliatory and not part of

21   defendant Perez-Pantoja's required searches for the day, noting that defendant Perez-Pantoja did

22   not claim credit for the search of Plaintiff's cell as the cell search log lists Officer Lomeli as the

23   officer who searched Plaintiff's cell and does not list defendant Perez-Pantoja.  ECF No. 22-3 at 7;

24   ECF No. 22-9 at 38.

25          Following the cell search, Plaintiff submitted a health care services request to be tested for

26   COVID-19, in light of defendant Perez-Pantoja's failure to change his mask and gloves before

27   entering Plaintiff's cell.  Plaintiff also requested to have his eyeglasses replaced.  ECF No. 22-2 at

28   3.  Plaintiff did not test positive for COVID after the cell search.

United States District Court
Northern District of California

Defendant Perez-Pantoja alleges that, on May 6, 2021, he was unaware of Grievance No. 53991.  ECF No. 18-2 at 3.  Defendant Perez-Pantoja further alleges that Officer Bravo never discussed any inmate grievances with him, and that he never discussed any inmate grievances with Plaintiff.  Officer Bravo alleges that he never discussed Plaintiff, Plaintiff's RVR, or Plaintiff's grievances with defendant Perez-Pantoja at any time.  ECF No. 18-2 at 3; ECF No. 18-3 at 2.

Plaintiff disputes defendant Perez-Pantoja's claim that he was unaware of Plaintiff's grievance against Officer Bravo and of Plaintiff's grievance activity generally, pointing to a conversation he had with defendant Perez-Pantoja on May 7, 2021, the day after the cell search took place.  On May 7, 2021, Plaintiff asked defendant Perez-Pantoja why he destroyed Plaintiff's property.  Defendant Perez-Pantoja responded, "You want to 602 my homeboy Bravo right?  Keep that shit up and you're gonna end up in the hole.  Good luck writing up shit without your glasses."  ECF No. 22-2 at 3.

On May 10, 2021, Plaintiff filed Grievance No. 117884, which alleged that defendant Perez-Pantoja destroyed his property during a May 6, 2021 cell search in retaliation for the grievance he filed against Officer Bravo.  ECF No. 1 at 16-17.  Grievance No. 117884 was granted in part by the Office of Appeals, returned to the Office of Grievance, and renumbered Grievance No. 174214.

On October 21, 2021, defendant Perez-Pantoja told Plaintiff to report the unit lieutenant's office and said, "Moreno, I already told you keep your shit up and you're going to up end up in the hole," and "Watch what you say to the Lieutenant."  Plaintiff then learned that he was being summoned to the office to be interviewed regarding Grievance No. 174214.  ECF No. 22-2 at 3.

## II.    Motion for Summary Judgment

### A.    Summary Judgment Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a) (2014).  Material facts are those that may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

United States District Court
Northern District of California

5

1  nonmoving party.  *See id.*

2      A court shall grant summary judgment "against a party who fails to make a showing

3  sufficient to establish the existence of an element essential to that party's case, and on which that

4  party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an

5  essential element of the nonmoving party's case necessarily renders all other facts immaterial."

6  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The moving party bears the initial

7  burden of identifying those portions of the record that demonstrate the absence of a genuine issue

8  of material fact.  *Id.*  The burden then shifts to the nonmoving party to "go beyond the pleadings

9  and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

10 file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *See id.* at 324

11 (citing Fed. R. Civ. P. 56(e)).

12      The court's function on a summary judgment motion is not to make credibility

13 determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W.*

14 *Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must

15 be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the

16 facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at 631.  If the

17 evidence produced by the moving party conflicts with evidence produced by the nonmoving party,

18 the court must assume the truth of the evidence submitted by the nonmoving party.  *See Leslie v.*

19 *Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

20      **B.      First Amendment Retaliation Claim**

21           **1)      Legal Standard**

22      Retaliation by a state actor for the exercise of a constitutional right is actionable under 42

23 U.S.C. § 1983, if the Plaintiff's constitutionally protected conduct was a motivating factor in the

24 adverse actions taken against her.  *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002) (citing *Mt.*

25 *Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  "Within the prison

26 context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An

27 assertion that a state actor took some adverse action against an inmate (2) because of (3) that

28 prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

United States District Court
Northern District of California

1    Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."

2    *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (footnote omitted).  The prisoner must

3    show that the type of activity he was engaged in was constitutionally protected, that the protected

4    conduct was a substantial or motivating factor for the alleged retaliatory action, and that the

5    retaliatory action advanced no legitimate penological interest.  *Hines v. Gomez*, 108 F.3d 265,

6    267–68  (9th Cir. 1997).

7            The second element, causation, requires showing that the prison official intended to take

8    the adverse action out of "retaliatory animus" to "silence and to punish" the inmate, as opposed to

9    for some other reason.  *Shepard v. Quillen*, 840 F.3d 686, 689-91 (9th Cir. 2016) (finding genuine

10   issue of material fact as to whether defendant sent inmate to administrative segregation with intent

11   to (1) follow 15 Cal. Code Regs. § 3335(a) or (2) retaliate for inmate's complaint about staff

12   misconduct).  Evidence probative of retaliatory animus includes proximity in time between the

13   protected speech and the alleged adverse action, the prison official's expressed opposition to the

14   speech, and the prison official's proffered reason for the adverse action being false or pretextual.

15   *See id.* at 690.  Retaliatory motive may also be shown by inconsistency with previous actions, as

16   well as direct evidence.  *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003).  Mere speculation

17   that defendants acted out of retaliation is not sufficient.  *Wood v. Yordy*, 753 F.3d 899, 904 (9th

18   Cir. 2014) (citing cases) (affirming grant of summary judgment where no evidence that defendants

19   knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in

20   reference to a prior lawsuit).

21                   **2)      Analysis**

22           Defendant Perez-Pantoja argues that he is entitled to summary judgment on the First

23   Amendment retaliation claim because Plaintiff cannot establish the second, fourth, and fifth

24   elements of a retaliation claim.  First, defendant Perez-Pantoja argues that Plaintiff cannot

25   establish the requisite causal connection between Grievance No. 53991, submitted on October 29,

26   2020, and the May 6, 2021 cell search because there was a "substantial time gap" of seven months

27   between the protected conduct and the cell search; because defendant Perez-Pantoja was unaware

28   of Grievance No. 53991 as of May 6, 2021 and could not have been aware of this grievance

United States District Court
Northern District of California

because neither Plaintiff nor Officer Bravo discussed Grievance No. 53991 with him; and because the cell search was random and part of his required duties.  Second, defendant Perez-Pantoja argues that Plaintiff cannot establish that defendant Perez-Pantoja's actions would not chill an inmate of ordinary firmness from exercising his right to file inmate grievances because Plaintiff filed two grievances against defendant Perez-Pantoja following the May 6, 2021 cell search; because an ordinary inmate would not be chilled from filing grievances where the officer never spoke with the inmate about their grievance activity before the cell search; because Plaintiff received new eyeglasses two months later; and because Plaintiff did not even listen to the two CDs that were broken.  Third, defendant Perez-Pantoja argues that Plaintiff cannot establish that the May 6, 2021 cell search did not reasonably advance a legitimate correctional goal because cell and property inspections are necessary to detect and control serious contraband and to maintain institutional security and because the Institutional Response found that defendant Perez-Pantoja had not committed any wrongdoing in connection with the May 6, 2021 search.

The Court DENIES defendant Perez-Pantoja's summary judgment motion with respect to Plaintiff's First Amendment retaliation claim because there are triable issues of material fact as to whether defendant Perez-Pantoja knew of Grievance No. 53991 prior to May 6, 2021, and as to whether the May 6, 2021 cell search was motivated by Grievance No. 53991 or served a legitimate penological purpose.

Viewing the record in the light most favorable to Plaintiff, a jury could find that defendant Perez-Pantoja knew about Grievance No. 53991 against officer Bravo because there is evidence in the record that defendant Perez-Pantoja was aware of the RVRs issued to Plaintiff and other inmates for constructive possession of a cellphone; at least one of the RVRs (Plaintiff's) was issued by officer Bravo; and on May 7, 2021, defendant Perez-Pantoja referenced a 602 against Bravo.

Viewing the record in the light most favorable to Plaintiff, a jury could infer that defendant Perez-Pantoja searched Plaintiff's cell and destroyed his glasses and CDs solely in retaliation for Grievance No. 53991 from the following evidence.  Although defendant Perez-Pantoja alleges that his search of Plaintiff's cell was a random search intended to fulfill his daily three cell search

United States District Court
Northern District of California

requirement, defendant Perez-Pantoja is not listed on the cell search log and the log credits officer Lomeli with this cell search. Plaintiff's glasses and CDs were found destroyed after defendant Perez-Pantoja's cell search and defendant Perez-Pantoja was the only person to enter the cell during the search. Defendant Perez Pantoja's response to Plaintiff's question about his destroyed property referenced the grievance against officer Bravo, the broken glasses, and Plaintiff's grievance activity generally. Defendant Perez Pantoja's response could also be construed as threatening to place Plaintiff in administrative segregation should Plaintiff continue filing grievances and warning Plaintiff that his glasses had been destroyed to hinder his grievance activity.

With respect to the fourth element of a retaliation claim, the destruction of property and threat of being placed in administrative segregation for engaging in protected activity would chill an inmate of ordinary firmness. *See Rhodes*, 408 F.3d at 569 (destruction of inmate's property and assaults on the inmate enough to chill inmate's First Amendment rights and state retaliation claim, even if inmate filed grievances and a lawsuit). The fact that Plaintiff filed two grievances against defendant Perez-Pantoja does not demonstrate a lack of chilling effect. The Ninth Circuit has held that a prisoner need not demonstrate a total chilling of his First Amendment rights in order to establish a retaliation claim. *See Rhodes*, 408 F.3d at 568-69 (rejecting argument that inmate did not state a claim for relief because he had been able to file inmate grievances and a lawsuit). It is sufficient if a prisoner's First Amendment rights were chilled even if not necessarily silenced. *Id.* at 569.

Because there are triable issues of material fact related to the First Amendment retaliation claim, defendant Perez-Pantoja is not entitled to summary judgment on the First Amendment retaliation claim unless he is entitled to qualified immunity.

## C.    Eight Amendment Violation

### 1)    Legal Standard

The Eighth Amendment requires that prison officials take reasonable measures to guarantee the safety of prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The failure of prison officials to protect inmates from dangerous conditions at the prison violates the Eighth

1    Amendment when two requirements are met: (1) the deprivation alleged is, objectively,

2    sufficiently serious; and (2) the prison official is, subjectively, deliberately indifferent to inmate

3    health or safety.  *Farmer*, 511 U.S. at 834. A prison official is deliberately indifferent if he knows

4    of and disregards an excessive risk to inmate health or safety by failing to take reasonable steps to

5    abate it.  *Id.* at 837.  The official must both be aware of facts from which the inference could be

6    drawn that a substantial risk of serious harm exists, and he must also draw that inference.  *See id.*

7    at 837.  With respect to the subjective prong of an Eighth Amendment violation, "deliberate

8    indifference entails something more than mere negligence, [but] is satisfied by something less than

9    acts or omissions for the very purpose of causing harm or with knowledge that harm will result."

10   *Farmer*, 511 U.S. at 835.  "To be cruel and unusual punishment, conduct that does not purport to

11   be punishment at all must involve more than ordinary lack of due care for the prisoner's interests

12   or safety."  *Whitley*, 475 U.S. at 319.  Neither negligence nor gross negligence will constitute

13   deliberate indifference.  *See id.* at 835-36 & n.4.  A prisoner need not wait until he is actually

14   assaulted or harmed to state a claim and obtain relief.  *See Farmer*, 511 U.S. at 845.

15              **2)      Analysis**

16        Defendant Perez-Pantoja argues that he is entitled to summary judgment on the Eighth

17   Amendment claim because Plaintiff cannot establish (1) that the failure to change out latex gloves

18   and masks between cell searches would lead to COVID-19 exposure, or (2) that Plaintiff suffered

19   harm as a result of the May 6, 2021 search since Plaintiff did not test positive for COVID-19 after

20   the cell search.  *See generally* ECF No. 18 at 14-15.

21        Plaintiff argues that a reasonable juror could conclude that defendant Perez-Pantoja knew

22   that his actions posed a substantial risk to Plaintiff's health from the following evidence in the

23   record:  Inmates are highly susceptible to contracting COVID-19 due to close living conditions.

24   COVID-19 poses an obvious risk to inmate health.  Defendant Perez-Pantoja deliberately

25   disregarded the social distancing guidelines set forth by the CDC and the CDC and CCHCS mask

26   mandates when he entered numerous cells with at least two other prison officers and searched one

27   cell for at least 30 minutes with these two other officers, rummaged through inmate's property, sat

28   on a bunk bed, and had his mask on his chin while sweating heavily.  At a minimum, Defendant

United States District Court
Northern District of California

1    Perez-Pantoja should have changed his sweat and saliva-soaked mask prior to entering Plaintiff's

2    cell.  A reasonable juror could also conclude that defendant Perez-Pantoja acted maliciously in

3    failing to follow the CDC and CCHCS COVID-19 guidelines because he told Plaintiff, "Good

4    luck writing shit up without your glasses," the day after the search.  Finally, Plaintiff argues that

5    harm is not a requirement to state an Eighth Amendment claim for deliberate indifference to

6    inmate safety.

7           Plaintiff is correct that the Eighth Amendment does not require that an inmate suffer harm

8    to state a claim for deliberate indifference to inmate safety.  The Eighth Amendment protects

9    against conditions of confinement that pose an "unreasonable risk of serious damage to [an

10   inmate's] future health."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny

11   an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on

12   the ground that nothing yet had happened to them."); *see also Farmer*, 511 U.S. at 845.  However,

13   the Court finds that defendant Perez-Pantoja is entitled to summary judgment on Plaintiff's Eighth

14   Amendment claim because, viewing the record in the light most favorable to Plaintiff, there is no

15   triable issue of material fact as to whether defendant Perez-Pantoja failed to take reasonable steps

16   to abate Plaintiff's exposure to COVID-19 when he did not change his latex gloves and mask

17   between cell searches, failed to adhere to social distancing recommendations when searching cells,

18   and wore his mask down around his chin.

19          Defendant Perez-Pantoja's actions and inactions did not unreasonably expose Plaintiff to

20   contracting COVID-19.  Neither the CDC nor prison policy identified changing of latex gloves

21   and masks between cell searches as necessary to mitigate COVID exposure, and there is no

22   evidence in the record that the failure to change PPE between cell searches increased inmates' risk

23   to COVID.  Prison guidelines acknowledged that social distancing was not always possible.  ECF

24   No. 22-7 at 85-89 (March 18, 2021 CCHCS Memorandum, titled "Recommended COVID-19

25   Personal Protective Equipment for Staff and Inmate-Patients Update").  While it is undisputed that

26   defendant Perez-Pantoja failed to wear his mask properly, *see* ECF No. 22-7 at 79 (October 27,

27   2020 CCHCS Memorandum, titled "Staff Wearing Facial Coverings and Physical Distancing

28   Requirements in Institutions and Facilities" stating that properly worn face coverings covered the

United States District Court
Northern District of California

11

nose, mouth, and chin), and that he did not maintain social distance from the other correctional officers in the cells searched prior to searching Plaintiff's cell, Plaintiff has not provided any evidence that defendant Perez-Pantoja's failure to social distance and improperly worn face mask unreasonably exposed Plaintiff to a risk of contracting COVID-19.  Plaintiff was not in the cell when the search was conducted.  There is no allegation that the other two correctional officers were not properly wearing their PPE or that these correctional officers had been exposed to COVID-19 recently.  At the time of the cell search, CTF was not in the midst of a COVID outbreak and had reported only two COVID cases in inmates in the prior fourteen days.  *See* https://www.cdcr.ca.gov/covid19/population-status-tracking/ (last visited Sept. 2, 2023). Vaccinations had been made available to inmates and correctional staff since January 2021.  *See* https://www.cdcr.ca.gov/covid19/updates/ (last visited Sept. 2, 2023).  The mere failure to follow prison COVID guidelines exactly does not suffice to allege a constitutional violation.  *Cf. Fraihat v. U.S. Immigration & Customs Enforcement*, 16 F.4th 613, 639 (9th Cir. 2021) (failure of ICE COVID policies for immigration detention centers to fully align with CDC recommendations and to "more strongly recommend social distancing" "did not support a finding of deliberate indifference"); *Peyton v. Cates*, No. 1:22-cv-00151-JLT-EPG (PC), 2022 WL 1430752, at *5 (E.D. Cal. May 5, 2022), *adopted*, 2022 WL 2307789 (E.D. Cal. June 27, 2022) (" . . . prison policy  . . . alone [is not] determinative of constitutional requirements") (citation omitted); *Jones v. Sherman*, No. 1:21-cv-01093-DAD-EPG (PC), 2022 WL 783452, at *8 (E.D. Cal. Mar. 11, 2022) ("the failure to follow certain COVID-19 guidelines, without more, is insufficient to satisfy the subjective prong of the deliberate indifference standard") (footnote omitted).  Here, there is nothing in the record from which it may be reasonably inferred that defendant Perez-Pantoja drew the inference that the failure to properly wear his face mask and to social distance from other correctional officials during cell searches and to change his mask and gloves before searching Plaintiff's cell exposed Plaintiff to a substantial risk of contracting COVID.  The Court GRANTS summary judgment in favor of defendant Perez-Pantoja on the Eighth Amendment claim.

### D.    Qualified Immunity

Qualified immunity is an entitlement, provided to government officials in the exercise of

their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of officer's misconduct. *Pearson*, 555 U.S. at 232. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Because there was no violation of Plaintiff's constitutional rights, as explained above, the Court need not inquire further into the second prong. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

With respect to the Eighth Amendment claim, there is no necessity for further inquiry concerning qualified immunity because, as explained above, there was no violation of Plaintiff's Eighth Amendment right to be free from deliberate indifference to his safety.

With respect to the First Amendment claim, defendant Perez-Pantoja is not entitled to qualified immunity. Defendant Perez-Pantoja argues that he is entitled to qualified immunity because there is no controlling legal authority clearly establishing that conducting a random cell search with latex gloves and mask was an adverse action within the meaning of the First Amendment. However, Plaintiff has identified the adverse actions as the cell search and destruction of his property, not the failure to change out the mask and glove prior to entering

13

Plaintiff's cell.  As discussed above, there is a triable issue of fact as to (1) whether the cell search was one of defendant Perez-Pantoja's required daily three cell searches to ensure prison security or retaliatory, and (2) even if the cell search was not retaliatory, whether defendant Perez-Pantoja destroyed Plaintiff's property during the search in retaliation for Plaintiff's protected activity.  It is clearly established law in the Ninth Circuit that that the destruction of an inmate's property in retaliation for the inmate's protected conduct is considered an adverse action and violates the First Amendment.  *Rhodes*, 408 F.3d at 568 (allegation that prison officials arbitrarily confiscated, withheld, and eventually destroyed inmate's property, threatened to transfer inmate to another correctional institution, and ultimately assaulted inmate satisfies adverse action element of First Amendment claim).  It is also clearly established law in the Ninth Circuit that "prison officials may not abuse a valid procedure as a cover or a ruse to silence and punish an inmate." *Shepard v. Quillen*, 840 F.3d 686, 694 (9th Cir. 2016) (internal citation and quotation omitted).  Any reasonable prison official in defendant Perez-Pantoja's position would have known that retaliating against plaintiff with an unnecessary cell searches or by destroying his property because Plaintiff had filed a grievance would violate the First Amendment.  Defendant Perez-Pantoja is therefore not entitled to qualified immunity on Plaintiff's First Amendment retaliation claim.

## CONCLUSION

For the reasons set forth above, the Court orders as follows.

1.     The Court GRANTS IN PART AND DENIES IN PART defendant Perez-Pantoja's motion for summary judgment.  ECF No. 18.  The Court GRANTS summary judgment in favor of defendant Perez-Pantoja on the Eighth Amendment claim.  The Court DENIES summary judgment with respect to the First Amendment retaliation claim.

2.     The claim remaining in this action is whether, on May 6, 2021, defendant Perez-Pantoja retaliated against Plaintiff in violation of the First Amendment by searching his cell and destroying his property.

3.     The case is hereby REFERRED to Magistrate Judge Robert Illman for settlement proceedings pursuant to the Pro Se Prisoner Mediation Program.  Such proceedings shall take place within 120 days of the date this order is filed, or as soon thereafter as Magistrate Judge

United States District Court
Northern District of California

1   Illman's calendar will permit.  Magistrate Judge Illman shall coordinate a place, time and date for

2   one or more settlement conferences with all interested parties and/or their representatives and,

3   within fifteen days of the conclusion of all settlement proceedings, shall file with the Court a

4   report thereon.  The Clerk is directed to serve Magistrate Judge Illman with a copy of this order

5   and to notify Magistrate Judge Illman that a copy of the Court file can be retrieved from the

6   Court's electronic filing database.

7       4.      In view of the referral, further proceedings in this case are hereby STAYED.  The

8   Clerk shall ADMINISTRATIVELY CLOSE this case until further order of the Court.  If the case

9   is not settled, the Court will enter a new scheduling order for further proceedings.

10      This order terminates ECF No. 18.

11      **IT IS SO ORDERED.**

12  Dated:  January 5, 2024

13                                                          _____

14                                                          JON S. TIGAR
                                                            United States District Judge